**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

YAHIA ABDOU, as assignee of HANAN
MOHAMED,

      Plaintiff and
      Counterclaim Defendant,

    v.

CITADEL SERVICING CORPORATION d/b/a
ACRA lending,

      Defendant and
      Counterclaim Plaintiff,

    v.

HANAN MOHAMED,

      Counterclaim Defendant.

No. 23 CV 16135

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

In August 2022, Hanan Mohamed bought a condo in Hyde Park for her son,

plaintiff Yahia Abdou, to live in while attending graduate school. She financed

$130,000 with defendant Citadel Servicing Corporation. Mohamed paid the loan in

full in November 2023. Citadel claims that Mohamed still owes $10,577.21 on the

loan consisting of prepayment penalties, late charges, and legal costs relating to the

nonpayment of the penalties.

Abdou filed this lawsuit, as assignee of Mohamed, alleging breach of contract

and violations of the Truth in Lending Act, Illinois Residential Mortgage Loan Act,

Illinois Consumer Fraud Act, and Illinois Mortgage Act. Citadel counterclaimed

alleging fraud and breach of contract against Abdou and Mohamed. Both parties move for summary judgment.

## I. Legal Standard

Summary judgment is warranted if there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "'Material facts' are facts that 'might affect the outcome of the suit,' and a dispute as to those facts is 'genuine' if 'the evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party.'" *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The non-moving party is given "the benefit of conflicting evidence and any favorable inferences that might be reasonably drawn from the evidence." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022).

## II. Facts

Plaintiff Yahia Abdou is the son of counterclaim defendant, Hanan Mohamed. [75] ¶ 5.[1] Both Abdou and Mohamed are Egyptian citizens. [75] ¶¶ 4–5. Mohamed

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to transcripts, which use the transcript's original page number. When a document has numbered paragraphs, I cite to the paragraph, for example [1] ¶ 1. The facts are largely taken from Abdou's response to Citadel's Local Rule 56.1 statement, [73], Citadel's response to Abdou's 56.1 statement of facts, [75], and Citadel's response to Abdou's statement of additional facts, [82], where both the asserted fact and the opposing party's response are set forth in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); [73] ¶ 21; [75] ¶¶ 15, 20. Citadel claims to lack sufficient knowledge to admit or contest paragraphs 15–16 of plaintiffs' statement of additional facts. [82] ¶¶ 15–16. Such responses are unacceptable at the summary judgment stage and constitute de facto admissions. *Karazanos v. Madison Two*

lives in Saudi Arabia. [75] ¶ 5. Abdou is a graduate student at the University of Chicago. [75] ¶ 4.

In June 2022, Abdou contacted defendant Citadel Servicing Corporation about financing the purchase of a condominium unit in Hyde Park. [75] ¶ 9. Abdou emailed a Citadel loan officer the property information and a list of questions including whether his mother being abroad presented any issues and if it would be better to seek a loan in his name instead, listing Mohamed's down payment as a gift. [77-6] at 3–4. Citadel responded that Mohamed being abroad would not be an issue, but it was their choice who would be on the loan. [77-6] at 4–5.

Abdou completed a loan application and emailed the representative to explain that he planned to stay in the apartment during his PhD program, but since he was an F1 student in the U.S. temporarily, he "indicated that the property [was] not [his] primary residence, and since [he would] be renting out the second room in the apartment, [he] indicated that it would be an investment property." [77-6] at 7.

Citadel responded that because Abdou planned to live in the apartment, it could not use Abdou as the borrower "for the loan as it wouldn't be considered an investment property according to [its] guidelines." *Id*. The loan officer stated that he

_____

*Assocs.*, 147 F.3d 624, 626 (7th Cir. 1998). I disregard all immaterial facts and legal conclusions. *See* [73] ¶¶ 15–18, 20, 22, 26; [75] ¶ 17. I also ignore facts included in statements or responses that are not supported by the parties' cited evidence. N.D. Ill. Local R. 56.1(d)(2), (e)(3); *see* [73] ¶¶ 9, 19. General objections to how facts are characterized, *see* [73] ¶¶ 4, 6, 11, 13, are sustained and I omit the characterizations and rely on the underlying evidence when possible. When the parties dispute facts and both rely on admissible evidence, I set forth both sides' facts.

was "escalating the situation to [his] higher ups to see if [Citadel could] proceed with [Abdou's] mother on the loan." *Id.*

Abdou later asked if he could "qualify for a loan of the property as a secondary/primary residence rather than an investment property," using his university stipend as his income. [77-6] at 8. Citadel responded that Abdou's education funds were not qualifying income. [77-6] at 9. The employee advised, "I think the best route will be to have your mother be on the loan. It may take a little longer, but it might be our only option." *Id.* The employee later informed Abdou that he "got approval for [Abdou's] mother to be on the loan." [77-6] at 13.

Mohamed told Citadel employees that she intended to purchase the condo under her name so that Abdou could live there while he attended graduate school. [73] ¶ 5. Mohamed testified that she first sought a "private" loan with Citadel, and then Citadel at some point changed that terminology to "investment."[2] [65-1] at 64.

In mid-July, the loan officer called Abdou regarding the property's insurance policy. [21-1] at 22. He told Abdou to take himself off the policy because "just your mother needs to be on the policy as an investor-with it listed as an investment property. When you, uh, put yourself on there and said that you were gonna be living there, it makes it so it's a primary residence policy, which we can't allow for the purpose of this loan specifically. Um, so that just needs to we're-we're having a

_____

[2] Foreign nationals cannot obtain residential loans to buy property within the United States through Citadel, rather they can only buy property as an investment property. [73] ¶ 12. Citadel's loan officer did not recall whether he discussed this with Abdou and Mohamed. [68-5] at 20:9–13.

difficult time explaining that to them because, uh-the way you worded it. So you just need to call and take your own name off that policy and um, list it as an investment property under just your mother's name." *Id.*

In early August, Abdou emailed Citadel to ask if he needed to sign a waiver. [68-13] at 2. Citadel responded "What waiver are you looking for? This is a NON TRID/Business Purpose loan and does not have a Closing Disclosure (CD) waiting period or a 3 day recession period." *Id.* Abdou responded, "I must have been confused then, if there's no waiver to sign then that's totally fine. Thank you for clarifying!" *Id.*

Mohamed completed the loan application, which Abdou signed on August 15, 2022, as her representative. [73] ¶ 29. Citadel prepared a Business Purpose Loan Certification and Attestation. [73] ¶ 7. The attestation stated:

> By signing this document, I am confirming that my loan request is for business purposes and not household purposes, and that the loan proceeds are intended to be used and will in fact be used for business purposes only, and not my personal use. I also represent that I do not occupy the property as my Primary Residence or as a Second Home. I intend to lease or rent the property to a third party.

[68-10] at 2. The certification also stated, "because the loan will be made exclusively for business purposes, laws applicable to consumer purpose transactions . . . are not applicable to this loan." *Id.* Abdou signed the certification as Mohamed's representative on August 15, 2022. *Id.*

Citadel prepared a closing package to finance the purchase of the condo. [73] ¶ 14. The closing lasted a week between initial document signing and funding, and two sets of loan documents were prepared. [73] ¶ 15. The first set included a prepayment penalty addendum. *Id.* Mohamed would incur five percent interest on

5

the principal loan amount remaining, "if Prepayment is made within the first twelve-month period immediately following the date the loan was made." [73] ¶¶ 16–18. On August 15, 2022, Abdou signed the first closing package, including the prepayment addendum. [73] ¶¶ 20–21.

Citadel then prepared a second set because an identification number had been omitted from the original note and mortgage. [73] ¶ 15. The second set included the note and mortgage but made changes and omissions beyond the inclusion of the identification number. *Id.*; [73-1] at 152–180. Other riders in the first set, such as the fixed interest rate rider, a 1–4 family rider, and a condominium rider, were still included in the second set, but not the prepayment addendum. [73] ¶ 15. Abdou signed the second set of documents as agent of Mohamed. *Id.*

After execution, Citadel distributed $130,000 to Mohamed. [73] ¶ 22. Mohamed purchased the condo, and Abdou moved there in late August 2022. [73] ¶ 23. Mohamed never lived at the condo. [73] ¶ 24.

In July 2023, Mohamed paid the loan balance in full. [73] ¶ 25. Citadel charged Mohamed prepayment interest according to the addendum. [73] ¶ 26. When Citadel first billed Mohamed for a prepayment penalty, she reached out to Citadel customer service, who told her: "I can confirm based on the mortgage note that the loan does not have a prepayment policy. Please disregard the billing statement." [73-1] at 69.

Citadel continued to pursue the prepayment penalties and Abdou, as Mohamed's representative, brought this case alleging claims under the Truth in Lending Act, the Illinois Residential Mortgage License Act, the Illinois Consumer

Fraud Act, the Illinois Mortgage Act, and for breach of contract. [1]. Citadel responded with counterclaims against Abdou and Mohamed for breach of contract and fraud. [10].

### III. Analysis

The parties now move for summary judgment. [19], [63], [68]. Abdou and Mohamed seek partial summary judgment on their claims under the Truth in Lending Act, the Illinois Residential Mortgage License Act, the Illinois Consumer Fraud Act related to Citadel's alleged mischaracterization of the loan's purpose, the Illinois Mortgage Act, and on Citadel's affirmative defenses and counterclaims. [19], [63]. They do not move for summary judgment on their breach of contract alleging that the prepayment penalty was not part of the mortgage note and their associated ICFA claim. [63]. Citadel moves for summary judgment as to all claims. [68]. No party has demanded a jury trial.

#### A. Truth in Lending Act and Illinois Residential Mortgage License Act

##### 1. *Applicability of TILA and IRMLA*

Almost all of the claims in this case hinge on whether the Truth in Lending Act and the Illinois Residential Mortgage License Act apply to Citadel's loan to Mohamed. TILA and IRMLA aim to protect consumers from unfair credit practices. *Marr v. Bank of Am., N.A.*, 662 F.3d 963, 966 (7th Cir. 2011) (citing 15 U.S.C. § 1601(a)); 205 ILCS 635/1-2(b). TILA applies broadly to consumer credit transactions, i.e., when the "money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." *See* 15 U.S.C.

7

§ 1602(i). TILA exempts transactions "primarily for business" or "commercial" purposes from coverage. 15 U.S.C. § 1603(1). Similarly, IRMLA applies to "any loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling." 205 ILCS 635/1-4(f).

The parties identify no binding appellate standard for determining when a loan is primarily for consumer or business purposes under TILA or IRMLA.[3] Regulation Z, TILA's implementing regulation, provides some considerations to help lenders determine when a transaction is for business purposes:

> A. The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.
>
> B. The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.
>
> C. The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.
>
> D. The size of the transaction. The larger the transaction, the more likely it is to be business purpose.
>
> E. The borrower's statement of purpose for the loan.

---

[3] Under the Fair Debt Collection Practices Act, which covers debts "arising out of a transaction" entered into "primarily for personal, family, or household purposes," 15 U.S.C. § 1692a(5), "[d]etermining the purposes for which a debt was incurred is necessarily a fact-based, case-specific inquiry." *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 580 (7th Cir. 2019).

12 C.F.R. § 1026.3, Supp. 1, comment 3(a)–3(i); *Thorns v. Sundance Properties,* 726 F.2d 1417, 1419 (9th Cir. 1984) (adopting factors as legal test to determine a borrower's purpose).

The parties' description of a loan is not dispositive. *See* 12 C.F.R. § 1026.3, Supp. I, Comment 3(a)–1 ("Primary purposes. A creditor must determine in each case if the transaction is primarily for an exempt purpose. If some question exists as to the primary purpose for a credit extension, the creditor is, of course, free to make the disclosures, and the fact that disclosures are made under such circumstances is not controlling on the question of whether the transaction was exempt."). "[L]isting a property as an 'investment' property on loan documents suggests a business purpose." *Gilliam v. Levine*, 562 F.Supp.3d 614, 624 (C.D. Cal. 2021), *aff'd*, No. 21-56257, 2023 WL 2770922 (9th Cir. Apr. 4, 2023); *see also Acevedo v. Loan Co. of San Diego*, No. 20-CV-1263-BAS-MSB, 2020 WL 4596760, at *3–5 (S.D. Cal. Aug. 10, 2020) (noting that loan disclosure statement asserted that property was held for investment purposes); *Daniels v. SCME Mortg. Bankers, Inc.*, 680 F. Supp. 2d 1126, 1130 (C.D. Cal. 2010) (finding listing of property as "investment" on loan application was a "significant deficiency" as to personal purpose).

But because TILA is a remedial statute primarily intended to protect consumers, courts conducting a purpose analysis look to "the substance rather than the form' of the relevant transactions." *Cole v. U.S. Capital, Inc.,* 389 F.3d 719, 727 (7th Cir. 2004) (Fair Credit Reporting Act case) (quoting *Clark v. Rent–It–Corp.,* 685 F.2d 245, 248 (8th Cir. 1982) (TILA case)). "[T]he form of the transaction is far less

important than 'the substance of the transaction and the borrower's purpose in obtaining the loan.'" *People's Bank of Arlington Heights v. Atlas*, 2015 IL App (1st) 133775, ¶ 28 (quoting *Riviere v. Banner Chevrolet, Inc.,* 184 F.3d 457, 462 (5th Cir. 1999)). The "entire surrounding circumstances" of the transaction determine a borrower's primary motive. *Cobb v. Monarch Fin. Corp.,* 913 F.Supp. 1164, 1174 (N.D. Ill. 1995) (quoting *Tower v. Moss,* 625 F.2d 1161, 1166 n.4 (5th Cir. 1980)); *see also Shames–Yeakel v. Citizens Fin. Bank,* 677 F.Supp.2d 994, 1002 (N.D. Ill. 2009).

Abdou has presented evidence to support a finding that Mohamed sought the loan for family purposes. The undisputed facts as applied to the first four Regulation Z factors favor Mohamed. First, Mohamed's primary occupation is not related to her acquiring the condo—she is a gynecologist. [65-1] at 61. Citadel does not dispute that Mohamed had no prior history or experience in buying real estate in the United States. [75] ¶ 15. Instead, it argues that Mohamed dealt in real estate because her loan application categorized her other two properties as "investments." [68-1] at 4. But one property was Mohamed's home in Egypt and the other was an apartment that Mohamed originally purchased for her daughter's family and began renting out in part after her daughter divorced. [65-1] at 80, 85. Even assuming that these properties were investments, there is no evidence linking them to the condo purchased for Abdou. *See, e.g., Friedman v. Maspeth Fed. Loan & Sav. Ass'n*, 30 F.Supp.3d 183, 193 (E.D.N.Y. 2014)[4] (purchasing home for daughter was a consumer

---

[4] *Friedman* addressed the Real Estate Settlement Procedures Act, not TILA, but under the relevant regulations of both statutes, the provisions for determining when the exemption applies are identical. *See* 12 U.S.C. § 2606(b).

purpose despite borrower owning other property investments because there was no relationship between the investment properties and the purchased home).

Second, there is no evidence that Mohamed personally managed the condo, other than making mortgage payments. [65-1] at 26. Abdou was responsible for managing the condo, its upkeep, and costs. *Id.*

Third, the ratio of income from the condo to Mohamed's total income is low. The record does not indicate Mohamed's total income, but it does show she profited very little, if at all, from the condo. The loan application stated that she expected to receive $1850 per month in rental income, with an expected net monthly rental income of −$281.56. [68-14] at 4. The mortgage monthly payments ranged between $1000 and $1300, and the homeowner's association fees were around $900 a month. [65-1] at 118 (closing documents set the monthly payment at $1057.72); [65-1] at 17 (Abdou testifying the mortgage payments changed a couple times but were around $1300 a month); [65-1] at 24. Mohamed was not profiting from the property; that suggests that she purchased it for family, not business, purposes.

Fourth, the size of the loan was small, $150,000, consistent with a mortgage on a residential property. *See, e.g., Gilliam*, 562 F.Supp.3d at 623 (finding a loan for $150,000 relatively small); *Cox v. LB Lending, LLC*, No. EDCV 17-1580 JGB (SPx), 2017 WL 6820171, at *6 (C.D. Cal. Nov. 16, 2017) (finding loans of $180,000 and $270,000 consistent with personal purpose of home refinance).

The fifth factor is disputed. Citadel argues that Adbou and Mohamed "were fully aware that Mohamed had applied for and been issued an investment loan, not

a residential mortgage loan." [68-1] at 3–4, 6; [74] at 5. According to Citadel, "after multiple instances of being told the Loan was for a business purpose, and Plaintiff even admitting that the Condominium was for a business purpose, Plaintiff cannot now suggest that he was unaware of the type of Loan he subsequently received." [68-1] at 6. But borrowers are not expected to discern the nature of the loan under TILA. That burden falls on the lender. *See* 12 C.F.R. § 1026.3, Supp. I, Comment 3(a)–1 ("Primary purposes. A creditor must determine in each case if the transaction is primarily for an exempt purpose."). The appropriate question is whether Abdou and Mohamed put Citadel on notice that the loan was for family purposes. *See Russell v. WADOT Cap., Inc.*, No. C22-0531JLR, 2024 WL 4451541, at *13 (W.D. Wash. Oct. 9, 2024) ("[T]he fifth factor focuses on the borrower's statement of purpose, not any undisclosed purpose the borrower might have had in mind."). I consider the information that was available to Citadel when it approved and funded Mohamed's loan. *See id.*

Citadel argues that Mohamed's loan application and closing documents unequivocally demonstrate that Mohamed intended to purchase the condo as an investment, and that, at the time of extending the credit, all parties understood that the loan was for business purposes.[5] [68-1] at 4. In her loan application, Mohamed

---

[5] Citadel's loan officer did not recall whether he discussed Citadel's policy not to fund residential loans for foreign nationals with Abdou and Mohamed. [68-5] at 5. Citadel also does not elaborate how its own policies are relevant to Mohamed's purpose in seeking the loan, which is the focus of this inquiry.

categorized the condo as an "investment."[6] [68-14] at 4. Mohamed also signed a Business Purpose Loan Certification and Attestation, which stated:

> By signing this document, I am confirming that my loan request is for business purposes and not household purposes, and that the loan proceeds are intended to be used and will in fact be used for business purposes only, and not my personal use. I also represent that I do not occupy the property as my Primary Residence or as a Second Home. I intend to lease or rent the property to a third party.

[68-10] at 2.

While categorizing a property as an "investment" on loan documents suggests a business purpose, "the substance rather than the form of the relevant transactions" controls. *Cole*, 389 F.3d at 727. "The instrument consummating a loan may [] include[] provision[s] that g[i]ve it the superficial appearance of a commercial loan, yet . . . such provisions [may be] insufficient to overcome the true character of the loan as a consumer loan." *In re Dawson*, 411 B.R. 1, 37 (Bankr. D.D.C. 2008).

These documents do not suffice to establish as a matter of law that the loan was primarily for business purposes. The loan application only provided three options for the purpose of the purchase: "primary residence," "second home," or "investment property." [68-14] at 4. The property was not going to be Mohamed's primary or secondary residence since she was buying the home for her son, which she disclosed

---

[6] Citadel presents evidence that Mohamed applied for credit through Milo Credit, LLC prior to applying to Citadel. It attaches Milo's summary of the pre-approval application submitted by Mohamed for the same loan. [68-15]. Because Mohamed listed the loan type there as an investment property, Citadel argues that this shows Mohamed always intended to buy the condo for business purposes. [68-1] at 6. But Citadel was not aware of the contents of Mohamed's Milo application at the time she sought the loan with Citadel. While relevant to Mohamed's purpose for seeking financing generally, this evidence is ultimately irrelevant to the question of Mohamed's statements of purpose to Citadel.

to Citadel. The only applicable choice on the application was "investment." Mohamed also presents evidence that she would have understood "investment" to include purchasing a home for family purposes due to cultural differences. [82] ¶ 16; *see also* [75] ¶ 15 (Mohamed had no prior history or experience in buying real estate in the United States). Ultimately, "[i]t is the statutory definition of what is residential or investment property that counts, not the selection on a limited form provided by the seller." *Friedman*, 30 F.Supp.3d at 193 (finding borrower's selection of "investment" on loan application was not dispositive when the only other options were primary or secondary residence and borrower intended to purchase a home for his children).

The certification says that the condo was not for Mohamed's personal use, that she would not occupy the condo as her primary or secondary residence, and that she intended to lease or rent the property to a third party. [68-10] at 2. Those statements do not contradict Mohamed's intended, disclosed primary purpose to purchase the condo for her son to live in. Putting words in Mohamed's mouth by preparing a certification for her to sign does not undermine the borrowers' stated primary purpose.[7] Mohamed and Abdou told Citadel multiple times that Mohamed wanted to

---

[7] Citadel also points to an August 2022 email, in which Abdou did not challenge Citadel's characterization of the loan as for business purposes. [74] at 2 (citing [68-13] at 2). Upon Abdou asking the bank if he needed to sign a waiver prior to closing, a Citadel employee responded "What waiver are you looking for? This is a NON TRID/Business Purpose loan and does not have a Closing Disclosure (CD) waiting period or a 3 day recession period." [68-13] at 2. Abdou responded, "I must have been confused then, if there's no waiver to sign then that's totally fine. Thank you for clarifying!" *Id.* Citadel argues that Abdou admitted the loan was for business purposes. [74] at 2. But Abdou's response does not evince that Mohamed's primary purpose in purchasing the condo was business related. Citadel's determination this was a loan for business purposes, and Mohamed and Abdou's failure to rectify that (which was not their burden), are not controlling.

14

buy a condo for her son to live in while in graduate school. In early emails, Abdou wrote that he "plan[ned] on staying in the apartment during [his] PhD at the university of Chicago." [77-6] at 7. Citadel acknowledged this intent and told Abdou, "Since you plan on living in the apartment, we cannot use you [Abdou] for the loan as it wouldn't be considered an investment property according to our guidelines." *Id.* The employee stated that he was "escalating the situation to [his] higher ups to see if [Citadel could] proceed with [Abdou's] mother on the loan." *Id.* Abdou asked if he could "qualify for a loan of the property as a secondary/primary residence rather than an investment property." [77-6] at 8. Citadel responded that Abdou's education funds were not qualifying income. [77-6] at 9. The loan officer advised, "I think the best route will be to have your mother be on the loan. It may take a little longer, but it might be our only option." *Id.* The officer later informed Abdou that he "got approval for [Abdou's] mother to be on the loan." [77-6] at 13. Mohamed also told Citadel employees that she intended to purchase the condo under her name so that Abdou could live there while he attended graduate school. [73] ¶ 5.

The loan officer acknowledged that Abdou would be living in the apartment when he called Abdou regarding the property's insurance policy. He told Abdou to take himself off the policy because if his name were on it, it would be a primary residence policy, and that was contrary to how Citadel was booking the loan. [21-1] at 22.

These conversations show that Citadel was aware of Mohamed's motive of housing her son when purchasing the condo. And despite credit for family purposes being covered by TILA, Citadel categorized the loan as for business purposes.

Citadel argues that Mohamed's primary purpose was profit because she represented that she would rent out the condo. [68-1] at 4. In Abdou's initial email to Citadel, he described the property value and added that "[b]ased on comparisons to other similar properties in the same area, we expect that the monthly rental income from the property would be ~$2600 dollars." [77-6] at 4. Mohamed also indicated that she expected $1850 in monthly rent on the loan application. [68-14] at 4.

But Abdou told Citadel that he would be living in the condo and intended to rent out its second room, not the entire apartment. [77-6] at 7. A homeowner's decision to rent out part of their home does not render a loan primarily for a business purpose. *See, e.g., Hughes v. Cardinal Fed. Sav. & Loan Ass'n*, 566 F.Supp. 834, 845 (S.D. Ohio 1983) (concluding that the borrower renting the upstairs to help pay the mortgage did not negate that he was a consumer under TILA). When credit is used for both personal and business purposes, the dispositive question is the primary purpose. *See, e.g., Shames-Yeakel*, 677 F.Supp.2d at 1002–03; *Prayitno v. Nextep Funding LLC*, No. 17 C 4310, 2020 WL 3414955, at *7 (N.D. Ill. June 22, 2020); *Macheda v. Household Fin. Realty Corp. of N.Y.,* 631 F.Supp.2d 181, 185–87 (N.D.N.Y. 2008).

Citadel argues that Mohamed purchased the condo as a non-owner-occupied rental property, which is exempt from TILA. [74] at 2. Under Regulation Z, "[c]redit

extended to acquire, improve, or maintain rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes." 12 C.F.R. § 1026.3, Supp. 1, Comment 3(a)–4. Such commentary is "dispositive" unless "demonstrably irrational." *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565 (1980) (deferring to Federal Reserve Board opinions interpreting TILA and Regulation Z).

Courts have treated family members as an extension of the "owner" and have not considered arrangements housing family members to be "rental property." *See, e.g., Gilliam, Tr. of Lou Easter Ross Revocable Tr. v. Levine, Tr. of Joel Sherman Revocable Tr.*, 955 F.3d 1117, 1123 (9th Cir. 2020) (finding borrower trustee obtaining a loan to enable her niece, the trust beneficiary, to continue to live in the trust property to be for a consumer purpose); *Friedman*, 30 F.Supp.3d at 193 ("The fact that plaintiff has the means to buy a home for his child without seeking a profit from the purchase should not bar him from seeking relief under a federal statute designed to protect homeowners from abusive business practices."); *Shames–Yeakel*, 677 F.Supp.2d at 1002–3 (explaining a loan obtained to purchase a loft for one's son to live in rent-free could be considered a loan obtained for a family purpose); *Baldwin v. PBK Bank*, No. 2014-CA-000549-MR, 2016 WL 6819761, at *3–4 (Ky. Ct. App. Nov. 18, 2016) (unpublished nonprecedential opinion) (finding family purpose when plaintiff housed her parents, never charged them rent nor intended to do so, and never derived income from real estate or rental properties); *Hughes*, 566 F.Supp. at

845 (concluding that the borrower renting the upstairs to persons he considered family to help pay the mortgage did not negate that he was a consumer under TILA).

I agree. Extending the regulation on non-owner-occupied rental property to all non-owner-occupied properties used to house family would ignore TILA's statutory text defining a consumer loan as including credit for family purposes. *See* 15 U.S.C. § 1602(i). The commentary cited by Citadel does not "directly address non-owner-occupied property for family purposes." *See Friedman*, 30 F.Supp.3d at 191; *see also Hughes*, 566 F.Supp. at 845 (concluding "that the only reasonable interpretation of the term 'owner-occupied' is that it includes the person who pays the mortgage, as well as his immediate family"). The non-owner-occupied rental commentary does not apply here.

Citadel also argues that the loan cannot be considered for family purposes because Abdou was only living in the condo on a temporary basis while he completed his PhD. [81] at 3–4. Citadel offers no case law to support the proposition that buying a home for a child to live in temporarily would not be considered a loan for family purposes. *See id.* Nor does it offer any evidence of what Mohamed intended to do with the property after Abdou no longer needed it. Even if a borrower had amorphous intentions to rent or sell the home after it was no longer needed, the loan would be considered for family purposes if the borrower's primary intent were to house their family. *See Shames-Yeakel*, 677 F.Supp.2d at 997, 1002–03 (while property purchased for son to live in was an investment insofar as borrowers "hope[d] to sell it for a profit when their son ultimately move[d] out of it," a reasonable fact finder could conclude

18

that the purchase was primarily for a family purpose). When the purpose of an acquisition changes after seeking the loan, the original purpose still controls whether TILA and IRMLA apply. *See Russell*, 2024 WL 4451541, at *14; *Hughes*, 566 F.Supp. at 845.

Courts have also looked to "facts illustrating the actual use" of the funds to confirm the borrower followed through on their disclosed purpose. *Slenk v. Transworld Sys., Inc.*, 236 F.3d 1072, 1076 (9th Cir. 2001). "By focusing exclusively on select documentary evidence, rather than looking to the facts illustrating the actual use to which the [property] was put, the forest [i]s lost for the trees." *Id.* After Citadel distributed $130,000 to Mohamed, she purchased the condo, and Abdou moved in. [73] ¶¶ 22–23. Mohamed never lived there. [73] ¶ 24. She did not rent the condo for a profit—Abdou paid his mother to cover the mortgage amount and paid the apartment's other expenses himself. [65-1] at 17.

Citadel argues that only the trier of fact can weigh the documentary evidence against statements Mohamed and Abdou made to Citadel employees. [74] at 5. In deciding Abdou's motion for summary judgment, I construe the evidence strictly against the nonmovant and liberally in favor of Citadel. *Runkel*, 51 F.4th at 741. The question of a loan's purpose is "necessarily fact-intensive and highly contextual." *See Woods v. LVNV Funding, LLC*, 27 F.4th 544, 549 (7th Cir. 2022) (FCRA case). At the same time, summary judgment is appropriate when consideration of the relevant factors direct the conclusion that the loan was primarily for one purpose or the other. *See, e.g., Gilliam*, 562 F.Supp.3d at 622 (citing *Bergman v. Fid. Nat. Fin., Inc.*, No.

19

2:12-CV-05994-ODW, 2012 WL 6013040, at *4–5 (C.D. Cal. Dec. 3, 2012)) ("[A] court need not find that all factors point in one direction to grant summary judgment as to the primary purpose of a loan."); *Russell*, 2024 WL 4451541, at *14 ("Examining the transaction as a whole, paying particular attention to the purpose for which the credit was extended, the court conclude[d], based on the undisputed facts, that [plaintiff's] loans were primarily for a business purpose.").

Based on the undisputed facts, Mohamed sought the loan to buy a condo for her son to live in during graduate school. This is a family purpose under TILA and IRMLA, no matter how mightily Citadel tried to characterize it as a business loan. Citadel was on notice of this intent from the start. Some documents adopted by Mohamed call the loan a business loan, and there is evidence that Abdou and Mohamed intended to rent one bedroom of the property. But that is not enough for a finder of fact to conclude that the primary purpose was business, when the borrower's purpose is the lens to look through. The labels placed on the loan by the lender for Mohamed to sign and the suggestions of other remunerative use in part cannot change the primary purpose. At most, they introduce a dispute over one non-dispositive factor within Regulation Z. But there is no genuine dispute of fact to support a judgment that the loan was primarily for business purposes.

TILA and IRMLA apply to the loan.

### 2. Prepayment Penalty

TILA prohibits prepayment penalties on "residential mortgage loans" that are not "qualified mortgages." 15 U.S.C. § 1639c(c)(1). A residential mortgage loan is "any consumer credit transaction that is secured by a mortgage, deed of trust, or other

equivalent consensual security interest on a dwelling." 15 U.S.C. § 1602(dd)(5). "Dwelling" includes "individual units of condominiums or cooperatives." 15 U.S.C. § 1602(w). A mortgage is not qualified if it "has an annual percentage rate that exceeds the average prime offer rate for a comparable transaction, as of the date the interest rate is set – (I) by 1.5 or more percentage points, in the case of a first lien residential mortgage loan having a original principal obligation amount that is equal to or less than the amount of the maximum limitation on the original principal obligation of mortgage in effect for a residence of the applicable size, as of the date of such interest rate set, pursuant to the 6th sentence of section 1452(a)(2) of title 12." 15 U.S.C. § 1639c(c)(1)(B)(ii)(I).

The undisputed facts show that this loan was a consumer credit transaction secured by a mortgage on a condominium, i.e., a "residential mortgage loan" under TILA. *See* 15 U.S.C. § 1602(dd)(5); 15 U.S.C. § 1602(w). Citadel does not dispute that the loan exceeded the average prime offer rate for a thirty-year loan in August 2022, therefore, the loan was not a "qualified mortgage." [75] ¶ 20 ("The Mohamed loan exceeded the average prime offer rate for a 30-year fixed rate loan in August 2022 by 3.845%."); 15 U.S.C. § 1639c(c)(1)(B)(ii)(I). TILA prohibited prepayment penalties on this loan. Because Citadel imposed prepayment penalty in violation of TILA, Abdou is entitled to statutory damages up to $4000, actual damages, and attorney's fees and litigation expenses. 15 U.S.C. § 1640.

IRMLA also expressly prohibits prepayment penalties unless the penalty is disclosed in advance, the lender offers the borrower a loan without a prepayment

penalty, and the borrower declines the offer in writing. 205 ILCS 635/5-8(a). The licensee must also disclose the discount in rate received in consideration for a mortgage loan with the prepayment penalty. *Id.* There is no evidence that Citadel followed these requirements. Further, the amount of prepayment penalties in Citadel's document exceeds those permitted under IRMLA. 205 ILCS 635/5-8 ("2% of total loan amount if prepayment is made within the second 12-month period following the date the loan was made."); [73] ¶¶ 16–18 (setting the prepayment penalty at five percent the remaining principal). The prepayment penalty also violated IRMLA. Citadel's motion for summary judgment is denied. Abdou's motion for summary judgment on his TILA and IRMLA claims is granted.

## B. Breach of Contract Claim

Citadel moves for summary judgment on Abdou's breach of contract claim against it. "The essential elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) a material breach by the defendant, and (4) resultant injury to the plaintiff." *Khan v. Fur Keeps Animal Rescue, Inc.*, 2021 IL App (1st) 182694, ¶ 26. Abdou argues that the prepayment penalty was not part of the contract and Citadel improperly imposed those fees. [72] at 7.

Two sets of loan documents were prepared for closing on the condo. [73] ¶ 15. The first set included a prepayment addendum. Abdou signed this document on August 15, 2022. [73] ¶¶ 15, 20–21. Citadel then told Abdou that he would need to sign a second set of documents because the MERS identification number had been omitted from the original note and mortgage. [73] ¶ 15. The second set of documents

22

contained substantial differences in addition to including the identification number.
*Id.* While other riders that had been in the first set of documents were included in
the second, the second set did not contain a prepayment addendum. *Id.* When Citadel
billed Mohamed for the prepayment penalty, she contacted Citadel's customer service
who told her that "based on the mortgage note [] the loan does not have a prepayment
policy. Please disregard the billing statement." [73-1] at 69.

Abdou argues that there is a genuine dispute of fact as to whether the
prepayment penalty addendum was part of the mortgage that must be left for trial.
Citadel does not dispute the multiple sets of documents, *see* [68-1] at 8, but states
that Abdou's "assertion that the Loan does not have a Prepayment Penalty lacks any
factual basis, as the record clearly establishes that [Abdou] signed the Prepayment
Addendum attached to the Closing Package on August 15, 2022." [68-1] at 11. It
argues that the second set of loan documents does not change that Citadel always
required a prepayment penalty for investment loans. [81] at 4. But even if Citadel
had a policy to include prepayment penalties on investment loans, that is not proof
this contract included one. Abdou has raised a genuine issue of fact as to whether the
loan included a prepayment penalty. Citadel's motion for summary judgment is
denied.

### C.    Illinois Consumer Fraud Act

The Illinois Consumer Fraud Act provides consumers relief when businesses
engage in unfair and deceptive practices. 815 ILCS § 505. ICFA is "a regulatory and
remedial statute intended to protect consumers . . . against fraud, unfair methods of
competition, and other unfair and deceptive business practices." *Robinson v. Toyota*

*Motor Credit Corp.*, 201 Ill.2d 403, 416–17 (2002). To prevail on a claim under ICFA, Abdou must prove an unfair act or practice by Citadel; Citadel's intent that Abdou and Mohamed rely on the unfair practice; the unfair practice occurred during a course of conduct involving trade or commerce; and the practice caused actual damages. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019).

A practice is "unfair" when it (1) offends public policy as established by statutes, the common law or otherwise; (2) it is immoral, unethical, oppressive or unscrupulous; and (3) it causes substantial injury to consumers. *Robinson*, 201 Ill.2d at 417–18. "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 418.

Abdou has two theories of recovery under ICFA. First, Abdou argues that it is an unfair practice to document a consumer loan as a business loan to avoid legal restrictions on the terms of consumer loans, costing the consumer over $10,000, and then sue the consumer for fraud when she insists on her statutory rights. [72] at 6.

On this record, Citadel's erroneous categorization of the loan as for business purposes and applying prepayment penalties was an unfair practice. ICFA does not require egregious conduct nor that the defendant intend to defraud. The imposition of a prepayment penalty offended public policy as established by TILA and IRMLA, which aim to protect consumers. The back-and-forth over the loan negotiation, including over whose name the loan would be in, suggests that Citadel's conduct was not oppressive or unscrupulous, but the prepayment penalty causes substantial

24

injury to consumers because it strips them of TILA and IRMLA's protections. Abdou's motion is granted as to his ICFA claim based on Citadel's characterization of the loan.

Abdou's second theory is that Citadel's actions surrounding the two sets of closing documents and trying to enforce a penalty that was not part of the loan violated ICFA. Only Citadel moves for summary judgment on this part of Abdou's claim. As discussed above, there is a dispute of fact as to whether the prepayment penalty was part of the loan. Since Abdou's ICFA claim is predicated on the breach of contract claim, Citadel's motion for summary judgment is denied.

## D.     Breach of Contract Counterclaim

Citadel counterclaims that Mohamed and Abdou breached the loan agreement by failing to pay the prepayment fees. Citadel argues that the loan agreement executed by Citadel and Abdou, as Mohamed's attorney-in-fact, is a legally binding and enforceable contract consisting of a promise for prepayment fees. [68-1] at 11. And when Mohamed refused to pay the prepayment penalties, she breached the contract. *Id.*

Even assuming that Citadel is correct that the prepayment addendum was part of the contract, the penalty violates TILA and IRMLA. A contractual term is not inherently unenforceable as against public policy because of a statutory violation. *K. Miller Const. Co. v. McGinnis*, 238 Ill.2d 284, 293–94 (2010). "If the statute explicitly provides that a contractual term which violates the statute is unenforceable then, barring any constitutional objection, the term is unenforceable." *Id.* But if the statute indicates that a term is still enforceable and that the penalty for the violation lies elsewhere, then the contract may be enforced. *Id.* "[W]here the statute is silent, then

25

the court must balance the public policy expressed in the statute against the countervailing policy in enforcing contractual agreements." *Id.*

Both statutes unequivocally bar prepayment penalties on loans like Mohamed's. 15 U.S.C. § 1639c(c)(1) (unqualified mortgages "may not contain terms under which a consumer must pay a prepayment penalty for paying all or part of the principal after the loan is consummated."); 205 ILCS 635/5-8(a) (lenders may not "make, provide, or arrange a mortgage loan with a prepayment penalty" unless certain conditions are met). At the same time, they do not say that such penalties are unenforceable if improperly included in a loan. And they provide alternative remedies for statutory violations. 15 U.S.C. § 1640(a) ("any creditor who fails to comply with any requirement imposed under this part . . . is liable to such person in an amount equal to the sum of (1) any actual damage sustained by such person as a result of the failure."); 205 ILCS 635/4-16 ("A borrower injured by a violation of the standards, duties, prohibitions, or requirements of . . . this Act shall have a private right of action. . . . The remedies and rights provided for in this Act are not exclusive, but cumulative, and all other applicable claims are specifically preserved.").

Illinois has a strong public policy in enforcing contractual agreements. *Signapori v. Jagaria*, 2017 IL App (1st) 160937, ¶ 18 ("Because Illinois public policy favors the freedom to contract, we use our power to declare a contractual provision void on public policy grounds sparingly.") At the same time, TILA and IRMLA evince a strong public policy to protect consumers from precisely this kind of term. IRMLA's stated purpose "is to protect Illinois consumers seeking residential mortgage loans

and to ensure that the residential mortgage lending industry is operating fairly, honestly and efficiently, free from deceptive and anti-competitive practices." 205 ILCS 635/1-2(b). TILA similarly "protect[s] the consumer against inaccurate and unfair credit billing and . . . practices." 15 U.S.C.A. § 1601(a). "It is well settled that courts will not aid a plaintiff who bases his cause of action on an illegal act." *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill.2d 366, 380 (2005). To enforce prepayment penalties that are explicitly prohibited in both acts would abrogate the acts' stated purpose. It would place the burden on consumers to challenge and seek remedies for prohibited prepayment penalties, instead of placing the burden on lenders to comply with TILA and IRMLA in the first instance. The prepayment penalty addendum is unenforceable as a matter of public policy.

Citadel's motion for summary judgment is denied. Abdou and Mohamed's motions for summary judgment are granted.

### E. Illinois Mortgage Act

The Illinois Mortgage Act requires a mortgagee to deliver a release of the mortgage upon receiving "full satisfaction any payment of all sums or sums of money as are really due to him or her from the mortgagor." 756 ILCS § 905/2. Citadel would not release the mortgage because it claimed Mohamed owed $10,577.21 in prepayment penalties, late charges, and legal costs on the unpaid principal balance of $.01. [75] ¶ 18. Mohamed had paid the principal balance in full in July 2023. [73] ¶ 25. The prepayment penalties violated TILA and IRMLA and are unenforceable. Citadel was obligated to release the mortgage when Mohamed paid the balance in full. It did not. The IMA provides that failure to release a mortgage carries statutory

damages of $200 plus reasonable attorney's fees. 765 ILCS 905/4. Abdou's motion for summary judgment on liability and damages is granted.

### F.    Fraud Counterclaim

Citadel brings a claim for common-law fraud against Abdou and Mohamed. To establish fraud, Citadel must show "(1) a false statement of material fact; (2) known or believed to false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Yash Venture Holdings, LLC v. Moca Fin., Inc.*, 116 F.4th 651, 660 (7th Cir. 2024), *reh'g denied*, No. 23-3200, 2024 WL 4257157 (7th Cir. Sept. 20, 2024).

According to Citadel, Abdou and Mohamed falsely represented that the loan was for an investment purpose, while they were planning to use the condo as a residence. [68-1] at 12; [81] at 5. Citadel argues that it relied on this allegedly fraudulent misrepresentation and issued a loan that it would otherwise not have. [68-1] at 12.

But Citadel offers no evidence to support a finding that Abdou or Mohamed knew or believed any of their statements were false. Citadel points to the loan application, which stated that the condo would be an investment property. [81] at 5. There were only three options for property types on the application: "primary residence," "second home," and "investment"—only investment could apply to Mohamed. [68-14] at 4. Citadel does not dispute the evidence that Mohamed would have understood purchasing her son a residence as an "investment" due to cultural differences. [82] ¶ 16. Abdou also explained to the loan officer that he indicated the

condo would be an investment property "since [he] w[ould] be renting out the second room in the apartment" and because it would not be his "primary residence." [77-6] at 7. The business purpose certification, in context as a label imposed on Mohamed by Citadel, cannot be understood to be a knowingly false statement by Mohamed when Mohamed and Abdou fully disclosed the true purpose of the loan to anyone who would listen. And it was true that Mohamed did not intend to use the condo for her personal use or occupy it.

Citadel also fails to present evidence to show that its reliance on the alleged misrepresentations was justified. *See Pack v. Maslikiewicz*, 2019 IL App (1st) 182447, ¶ 105, *as modified on denial of reh'g* (Oct. 31, 2019) ("As part of its fraud claim, a plaintiff must show that its reliance on the misrepresentation was justified."). The record shows that Citadel knew Mohamed was purchasing the condo for her son to live in. Citadel also knew that Abdou intended to rent out the second bedroom, not the entire unit. Considering this, Citadel could not have reasonably relied on the loan application and certification to assume that the purchase was primarily for a business purpose.

On this record, there could be no verdict in favor of Citadel and against Mohamed or Abdou for fraud. Citadel's motion is denied; Abdou and Mohamed's motions for summary judgment on the fraud counterclaim are granted.

### G. Affirmative defenses

Citadel also raises various affirmative defenses. [10] at 10. Citadel argues that Abdou's claims are barred because the damages were caused by his own acts or omissions; Abdou failed to mitigate his damages; Abdou "gave his promise the loan

was for business purposes and not a consumer loan;" and Citadel reasonably relied on this promise. [10] at 10–11.

Citadel has offered no evidence to support these affirmative defenses, so cannot survive summary judgment. Citadel argues that its characterization of the case is enough to prove its defenses. [74] at 7. But these theories, many discussed above, do not hold weight. The record demonstrates that Citadel was aware of Mohamed's intent from the start and still chose to categorize the loan as for business purposes. Citadel offers no support that Abdou or Mohamed should be estopped from challenging Citadel's characterization of the loan as for business purposes. Citadel also does not explain how the damages were due to Abdou's own acts or omissions, how he failed to mitigate his damages, or how the doctrine of unclean hands applies here.

"Summary judgment is the 'put up or shut up' time in litigation." *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024). Citadel has not offered any evidence to create a genuine dispute of fact as to its defenses. Abdou and Mohamed's motions for summary judgment are granted.

**IV.      Conclusion**

Abdou and Mohamed's motions for summary judgment, [19], [63] are granted, although the damages awarded under TILA remain to be decided. Citadel's motion for summary judgment, [68], is denied. Mohamed's motion to dismiss the counterclaims, [35], is moot. Abdou's breach of contract and associated ICFA claim remain.

ENTER:

Manish S. Shah
United States District Judge

Date: March 31, 2025

31